UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| ) | |
| v.  ) | Criminal No. 07-04-P-H |
| ) | |
| CHRISTOPHER CONLEY,  ) | |
| ) | |
| Defendant  ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Christopher Conley, charged in a one-count indictment with making a false statement to a government agency (the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")) in violation of 18 U.S.C. § 1001(a)(2), *see* Indictment (Docket No. 15), seeks to suppress the contents of a phone call to which he was a party that was placed on January 7, 2007 by Kenneth Durgin, an inmate at the Maine Correctional Center ("MCC") in South Windham, Maine, and recorded by an MCC employee who then shared a compact disc of that recording with an ATF special agent. *See generally* Defendant's Motion To Suppress Evidence (Pursuant to Rule 12(b)(3)(C)) ("Motion To Suppress") (Docket No. 27).[1] An evidentiary hearing was held before me on April 2, 2007 at which the defendant appeared with counsel and at the conclusion of which counsel for both the defendant and the government argued orally. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

---

[1] The defendant originally sought to suppress the contents of ten recorded phone calls placed by Durgin from MCC between January 3 and January 12, 2007. *See* Motion To Suppress ¶¶ 3, 6, 10-11. The government challenged his standing to seek suppression of nine of those calls on the basis that he was not a party to them, *see* Government's Opposition to Defendant's Motion To Suppress Evidence ("Opposition") (Docket No. 30) at 8 n.6., and his counsel conceded at hearing that he did not have standing with respect to any call except for the January 7, 2007 call to which he was a party.

## I. Proposed Findings of Fact

In or about April 2006 ATF special agent Paul McNeil became involved in an investigation of a home invasion and shooting that occurred that month in Buxton, Maine. Two men were suspected of having perpetrated the invasion: David Nanos and Ryan Butterworth. In the course of investigating that incident, McNeil learned that Nanos and Butterworth had associates, one of whom was Kenneth Durgin. Over time, McNeil obtained information indicating that Durgin was involved in several unlawful activities, including possession of firearms following felony convictions, distribution of illegal drugs and intimidation of witnesses. McNeil continued to keep tabs on Durgin. In November 2006 he learned that Durgin had been convicted of a state probation violation for which he had been sentenced to fourteen months' imprisonment. Durgin was initially sent to Cumberland County Jail, then transferred to MCC to serve his sentence.

When inmates arrive at MCC they are given an orientation and handouts that include a form used to request a personal identification number ("PIN") for purposes of making telephone calls. Inmates are asked to list, on that form, names and phone numbers of people they intend to call. The orientation packet also includes a brightly colored sheet of paper containing the following warning:

**WARNING**

**IT IS POSSIBLE THAT COMMUNICATIONS BY OR WITH PRISONERS MADE THROUGH ANY TELEPHONE USED BY PRISONERS WILL BE LISTENED TO AND/OR RECORDED BY OR AT THE DIRECTION OF AN INVESTIGATIVE OFFICER EMPLOYED BY THE MAINE DEPARTMENT OF CORRECTIONS, EXCEPT FOR ATTORNEY-CLIENT COMMUNICATIONS.**

Gov't Exh. 2. No inmate can make calls from MCC without first obtaining a PIN, and no PIN can be obtained without first filling out the form requesting one. In conjunction with requesting a PIN, inmates are asked to list all names and phone numbers of persons they intend to call. *See* Dft's Exh. 1 at 3, ¶ 1. Once an inmate is assigned a PIN, he or she retains the same PIN and list of call recipients if

subsequently incarcerated in a Maine Department of Corrections ("MDOC") facility. An inmate may add or delete call recipients from the list. *See id.* at 3, ¶ 2.

Durgin had a PIN and call-recipient list as a result of previous incarceration at an MDOC facility. On December 29, 2006 he completed and signed the one-page PIN-request form to add an attorney's name and phone number to his list. *See* Gov't Exh. 1. With respect to non-attorney call recipients listed, the form warns: "Calls to the following numbers **MAY** be monitored[.]" *Id*. Near the bottom, the form states: "Your acceptance of a PIN and use of prisoner telephone shall be deemed as consent to the conditions and restrictions placed upon prisoner telephone calls. Consent is not being requested for the monitoring of phone calls, as the law does not require consent." *Id*.

Durgin was housed in the "A Pod" section of MCC. MCC affixes red plaques near every phone used by A Pod inmates to make outside calls stating:

> WARNING!
>
> IT IS POSSIBLE THAT COMMUNICATIONS BY OR WITH PRISONERS MADE THROUGH ANY TELEPHONE USED BY PRISONERS WILL BE LISTENED TO AND/OR RECORDED BY OR AT THE DIRECTION OF AN INVESTIGATIVE OFFICER EMPLOYED BY THE MAINE DEPARTMENT OF CORRECTIONS EXCEPT FOR ATTORNEY-CLIENT COMMUNICATIONS[.]

Gov't Exhs. 3-4. When an inmate places an outside call, the recipient (but not the inmate) hears a recorded warning stating that unless the call is an attorney/client call, it may be monitored. The warning directs the recipient to press zero to go forward with the call. The call cannot proceed unless the recipient does so. MCC prohibits inmates from using calling features such as call forwarding and three-way calling, which circumvent the jail's attempts to track the persons to whom outside calls are being placed. *See, e.g.*, Dft's Exh. 1 at 2, ¶ 3.

MCC does not monitor and record all outgoing calls placed by inmates. MDOC Policy No. 21.3, pertaining to the prisoner telephone system, provides, in relevant part:

> Prisoner telephone calls may be monitored by a departmental criminal investigator or an employee acting at the direction of a departmental criminal investigator if the investigator is conducting an investigation of an offense relating to the security or orderly management of the facility. Only those prisoner telephone calls suspected to be related to the investigation may be monitored. Appropriate documentation will be completed, including justification for the monitoring and the results of the monitoring. Recordings of any conversations related to the investigation will be maintained in accordance with departmental policy and procedures on preservation of evidence. Investigations will be coordinated with appropriate law enforcement agencies in accordance with departmental policy and procedures.[2]

*Id*. at 4, Procedure E, ¶ 1.

Peter Herring, an MDOC correctional investigator who maintains an office at MCC, is responsible for conducting investigations into alleged crimes, prison-rule infractions and other malfeasance occurring within MDOC facilities, including MCC. The line between "inside" and "outside" conduct can be blurry; Herring's criminal and administrative investigations can touch on matters going on outside as well as inside MDOC facilities and often have yielded information of interest to outside agencies and investigators. Herring regularly shares information with outside law-enforcement personnel, with whom he interacts on a daily basis. Herring, whose purview includes inmates' telephone usage, also has arranged for monitoring of inmates' phone calls at the request of outside law-enforcement personnel. He does not require a warrant but asks that the outside law-enforcement officer submit a request in writing, on the agency's letterhead, outlining a reason or reasons for the request.[3] If he determines that the request is related to MDOC's interests in the safety and orderly management of the jail, he forwards it on to the jail superintendent for approval. In his view, engagement by any inmate in criminal activity does in fact jeopardize the security and orderly management of the jail.

---

[2] No additional policies or procedures were offered in evidence.
[3] Herring also testified that he asks outside law-enforcement personnel to "establish probable cause" for such a request. However, it is not clear whether he meant that he requires establishment of "probable cause" in a legal sense.

4

MCC maintains machinery that detects whether inmates making outgoing calls are using prohibited calling features such as call forwarding and three-way calling. For quality-control purposes, to check the accuracy of the machine's reports, Herring will record an inmate's phone calls for a period of time, usually twenty-four to forty-eight hours. In Herring's experience, use of prohibited call features usually is consistent with illicit activity such as drug dealing.

At some point after Durgin was incarcerated at MCC – it is not clear from the record precisely when – MCC's machinery indicated that Durgin was using prohibited call features, including call forwarding and three-way calling. Quality-control recording of Durgin's calls corroborated these infractions. Herring orally requested permission from MCC Superintendent Scott Burnheimer to monitor all of Durgin's non-legal calls based on Durgin's infractions of MCC's phone policy. By memorandum dated December 25, 2006 Burnheimer granted that request. *See* Gov't Exh. 5.[4]

In early to mid December McNeil called MCC to inquire into the possibility of obtaining recordings of any phone calls Durgin might have placed, or might place, from the jail. He did so because he suspected, based on his ongoing criminal investigation of Durgin, that Durgin was continuing to conduct illegal activity from jail. He spoke with Herring's secretary, Nancy Vigue. McNeil asked Vigue whether it was possible to obtain recordings of Durgin's phone calls and, if so, what paperwork MCC might require. Vigue explained that McNeil should submit a letter on ATF letterhead explaining the reason for the request and that Herring, the jail's correctional investigator, would have to approve it. McNeil prepared a memorandum to Herring requesting copies of recordings of Durgin's phone calls made in the past, as well as recordings made going forward, for purposes of an ATF criminal investigation. He faxed the memorandum to Vigue. He later spoke with

---

[4] Burnheimer's memorandum actually is dated December 25, 2007. *See* Gov't Exh. 5. However, Herring testified that this was a typographical error and that the memorandum should have been dated December 25, 2006.

both Vigue and Herring, who confirmed that the request had been approved. McNeil retained no hard copy of his memorandum and typed over the original document he had created on his computer.[5]

Herring did not personally listen to Durgin's recorded calls; however, Vigue listened to them, copied them to compact discs and forwarded the discs to McNeil at Herring's request. Every few days, McNeil received a compact disc from Vigue containing copies of Durgin's recorded phone calls. For example, he received a compact disc containing recordings of calls placed by Durgin from MCC from January 1-8, 2007. He listened to all of those calls, all of which were placed to Durgin's mother, Gayle Guerard, and some of which his mother then forwarded to his girlfriend, Erin Lebel. From listening to these conversations, he deduced that Durgin was indeed using coded language to attempt to have his mother and girlfriend carry out what appeared to be drug-trafficking activities in his stead. Durgin's conversations also indicated his awareness that his calls were being monitored. For example, the following conversation transpired between Durgin and Lebel on January 2, 2007:

| | |
|---|---|
| Lebel: | I know you're watched very closely. |
| Durgin: | Who? |
| Lebel: | You! |
| Durgin: | What do you mean? |
| Lebel: | And me. I'm being watched, I'm being followed. |
| Durgin: | Oh yeah, I know that. |
| Lebel: | Alright. So anything, that, they's, our lines, my line is not tapped. It's extremely hard to get a number, cell phone, especially tapped. |
| Durgin: | Mmm hmm. |
| Lebel: | But you, on the other hand, are on a completely different [inaudible]. |
| Durgin: | Oh yeah, my shit's recorded all the time. |

Gov't Exh. 7. On January 3, 2007 Durgin and Lebel also engaged in the following conversation:

| | |
|---|---|
| Durgin: | Remember when I first got here, remember who I called? |
| Lebel: | Yup. |

---

[5] Herring testified that his office had already begun recording Durgin's phone calls for its own reasons as of the time McNeil happened to call to request that Durgin's calls be recorded. This is a doubtful proposition. McNeil testified that he made his inquiry in early to mid December; Burnheimer's authorization is dated December 25, 2006. Nonetheless, for purposes of the instant recommended decision I need not definitively resolve whether McNeil's request was made before Herring's office began recording Durgin's calls for its own purposes and/or before Burnheimer's written authorization.

| | | |
|---|---|---|
| Durgin: | | There'll be certain times when I'll call, right, on that. |
| Lebel: | | I can't hear what you're saying, that last part. |
| Durgin: | | There's gonna be certain times when I'm gonna call on that. You feel me? Because this is getting recorded? |
| Lebel: | | Yup. |

*Id*.

On January 7, 2007, during a recorded conversation with Durgin, Lebel handed the phone to the defendant. Gov't Exh. 8. The defendant discussed with Durgin details of the instant case. *Id*.

## II. Discussion

The defendant seeks to suppress the contents of the January 7, 2007 phone call made by Durgin, recorded by MCC and provided to McNeil on the basis that the communication was unlawfully intercepted and/or shared pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22 ("Title III"), also known as the Federal Wiretap Act. *See generally* Motion To Suppress; 18 U.S.C. §§ 2510-22; *United States v. Lewis*, 406 F.3d 11, 14 (1st Cir. 2005); *Gilday v. Dubois*, 124 F.3d 277, 296 (1st Cir. 1997).[6]

As the First Circuit has observed, "Title III prohibits the interception of telephone conversations, subject to certain exceptions, without a court order. Wire or oral communications intercepted in violation of Title III are inadmissible as evidence in court." *Lewis*, 406 F.3d at 14 (citations omitted); *see also* 18 U.S.C. §§ 2515, 2518(10)(a). Exceptions to the need for a court order include the so-called "consent exception" and the so-called "law-enforcement exception." *See Lewis*, 406 F.3d at 14; *see also* 18 U.S.C. §§ 2510(5)(a)(ii) (law-enforcement exception), 2511(2)(c) (consent exception).

The government invokes the consent exception, *see* Opposition at 7-9, which provides, in relevant part: "It shall not be unlawful under this chapter for a person acting under color of law to

---

[6] The defendant also originally invoked the Fourth Amendment as a basis for suppression. *See* Motion To Suppress ¶ 11. However, (*continued on next page*)

7

intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception[,]" 18 U.S.C. § 2511(2)(c). The government contends that Durgin both expressly and impliedly consented to interception of his telephone calls by (i) applying for a PIN on the condition that acceptance of the PIN and use of the phone system constituted consent to the conditions placed on his calls, (ii) using the phones despite warnings on plaques alongside them reminding him his calls could be monitored, and (iii) both explicitly stating that he knew his calls were being monitored and speaking in guarded language indicative of that knowledge. *See* Opposition at 9; *see also, e.g., United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006) ("In this case Hargrove impliedly consented to recording of the conversations. As previously noted, detainees at CCA [a privately operated prison that houses pretrial detainees under contract with the United States Marshals Service] receive numerous warnings that their calls may be recorded. Hargrove was undoubtedly well aware of these warnings; during a conversation with Mr. Rodgers he said, 'I can't hardly talk on this phone, cause you know they got it screened. . . . (The coded language used by Appellants indicates that they too were aware that the calls were being monitored.)"); *United States v. Footman*, 215 F.3d 145, 155 (1st Cir. 2000) ("Prison inmates have few expectations of privacy in their communications. There is no reason to think that Congress would not have included within the meaning of consent a prison inmate's express acceptance of having his calls recorded as a condition of using the telephone. This is particularly so given the deference and flexibility federal courts afford state officials in managing prisons.") (footnotes, citations and internal quotation marks omitted). The government further correctly points out that only one party to a telephone call (in this case, Durgin) need consent to its interception for Title III's consent exception to apply. *See* Opposition at 8; *see*

---

at hearing, his counsel withdrew that portion of the motion.

*also, e.g., Footman*, 215 F.3d at 154 ("It is settled law that only one party need consent to the interception of the calls.").

At hearing, counsel for the defendant acknowledged that Durgin had consented to the monitoring and recording of his calls but argued that the consent was limited to permission for an MDOC investigative officer to monitor and record his conversations solely for purposes of investigating possible offenses related to the security or orderly management of the jail. Thus, counsel reasoned, Durgin did not consent to monitoring and recording of any of his calls by McNeil or for ATF's criminal-investigatory purposes. Counsel for the government disagreed that Durgin's consent was in any way so cabined, positing that this case is materially indistinguishable from *United States v. Correa*, 220 F. Supp.2d 61 (D. Mass. 2002), in which the court rebuffed a nearly identical argument of limited prison-inmate consent. I agree.

In *Correa*, a case in which (as here) a jail official intercepted an inmate's phone calls and shared recordings of those calls with outside law-enforcement agents, defense counsel argued that the scope of his client's consent "was limited by two factors: the purpose for which inmate calls are monitored and recorded, or the object of the recording, in search and seizure terms, and the prohibition against random or general access by law enforcement agencies contained in PCCF-482 [a jail policy]." *Correa*, 220 F. Supp.2d at 64. The court rejected this contention, observing:

> Plymouth [the jail] expressed no object for its monitoring and recording in any of the notices that form the basis for a finding of consent. Inmates, such as Correa, are told merely that all calls will be monitored and/or recorded. No indication of why the calls are recorded is given in the document entitled 'Orientation to the Inmate Telephone System for Inmates,' for example. Nor is a purpose stated in the Inmate Telephone List. The recorded message callers and recipients hear before a call is accepted by the recipient also fails to mention a reason for the recording. Finally, PCCF-482 express[es] no object for the recording.

\*\*\*

> Co-defendant Correa consented to a monitoring and recording system that was unqualified in all relevant aspects. And, Plymouth officials expressed no object of the search that could be construed to limit its scope. Hence, the use of the recording as evidence is permissible under the consent exception to Title III.

*Id*. at 64-65.

Here, as in *Correa*, there is no evidence that MCC expressed an object for its monitoring or recording in any of the notices that form the basis for Durgin's consent, including the warning on brightly colored paper distributed during inmate orientation, the form used to request a telephone PIN and to add or delete call recipients or the plaques displayed near telephones. Nor did Durgin, in the excerpts of phone conversations supplied by the government, express awareness or belief that the scope of MCC's monitoring and recording of his phone calls was in any such way limited. At hearing, defense counsel sought to distinguish *Correa* on the bases that (i) language in the warning sheet distributed at inmate orientation stated that phone calls might be monitored and/or recorded "by or at the direction of an investigative officer employed by the Maine Department of Corrections[,]" Gov't Exh. 2, and (ii) MDOC Policy No. 21.3, unlike PCCF-482 in *Correa*, does express limitations on the object for phone monitoring and/or recording, *see* Dft's Exh. 1 at 4, Procedure E, ¶ 1. Neither point gains the defendant any traction. In accordance with the orientation warning (Gov't Exh. 2), the call in question was in fact monitored and recorded at Herring's direction. The warning is silent both as to the purpose for which calls may be monitored and recorded and whether, once calls are monitored or recorded, their contents may be shared with others outside the confines of MCC. With respect to MDOC Policy No. 21.3 (Dft's Exh. 1), while the *Correa* court did note that PCCF-482 expressed no object for recording, and nothing in the decision indicated Correa had seen or heard of that policy, the court made clear that for purposes of ascertaining the limits, if any, on the scope of an inmate's consent to telephone monitoring and recording, the only relevant notices or policies are those of which an inmate has knowledge. *See Correa*, 220 F. Supp.2d at 64-65 ("Plymouth expressed no object for its

monitoring and recording in any of the notices that form the basis for a finding of consent. . . . Co-defendant Correa consented to a monitoring and recording system that was unqualified in all relevant aspects."). There is no evidence that Durgin ever saw, read or heard of MDOC Policy No. 21.3.

To summarize: The call in question, placed from MCC by inmate Durgin on January 7, 2007, was monitored and recorded at the direction of an MDOC investigative officer (Herring), consistent with consent given by Durgin no later than December 26, 2006 to such monitoring and recording. Title III's consent exception therefore applies.

A final question remains: Whether the applicability of the consent exception obviates the need to consider the lawfulness of Herring's sharing of the contents of the January 7 call with McNeil and, if not, whether the sharing was otherwise lawful pursuant to Title III. As the government suggests, *see* Opposition at 10, several courts have held that Title III imposes no restriction on the use that can be made of a communication intercepted with the consent of at least one party to that communication, *see, e.g., United States v. Hammond,* 286 F.3d 189, 193 (4th Cir. 2002) ("[T]he FBI was free to use the intercepted conversations once they were excepted under either § 2510(5)(a)[(ii)] [the law-enforcement exception] or § 2511(2)(c) [the consent exception]."); *In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 624 (7th Cir. 2000) ("If by virtue of sections 2511(2)(c) or (d) an interception is not prohibited by Title III, there are *no* Title III restrictions on its use.") (emphasis in original). As the government further observes, *see* Opposition at 10, while the First Circuit has agreed that there are no Title III restrictions on the use that can be made of communications intercepted pursuant to the law-enforcement exception, it has left open the question whether the same is true with respect to the consent exception, *see Lewis*, 406 F.3d at 20 n.8 ("Two of our sister circuits have reached the same conclusion (that contents of communications acquired pursuant to § 2510(5)(a) [the law-enforcement exception] are exempt from Title III's restrictions) based on grounds that would also

11

exempt communications acquired pursuant to the § 2511(2)(c) consent exception. The reasoning we adopt today does not dictate this conclusion, nor does the case require us to decide whether the consent exception, like the law enforcement exception, places the acquired communications outside of Title III.") (citations omitted).[7]

The instant case does not oblige this court to wrestle with the question left open by the First Circuit. Even assuming *arguendo* that the applicability of the consent exception is not fully dispositive of the instant motion, the use made of Durgin's January 7, 2007 communication passes muster pursuant to Title III. As the government notes, *see* Opposition at 10-11, law-enforcement officers may disclose intercepted communications to their colleagues pursuant to 18 U.S.C. § 2517(1), which provides:

> Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

18 U.S.C. § 2517(1).

At hearing, defense counsel suggested that Herring's disclosure to McNeil was not appropriate to the proper performance of Herring's official duties inasmuch as (i) in contravention of Herring's own practice, he did not obtain "probable cause" from McNeil for the request to obtain recordings of Durgin's calls, (ii) the ATF criminal investigation was not an "investigation of an offense relating to the security or orderly management of [MCC,]" as required by MDOC Policy No. 21.3, and (iii) there is no written justification, as MDOC Policy No. 21.3 contemplates, for monitoring and recording of Durgin's calls at the ATF's request.[8]

---

[7] At hearing, counsel for the government confirmed that the government does not invoke the law-enforcement exception in this case.
[8] At hearing, defense counsel conceded that Herring qualified as an investigative or law-enforcement officer for purposes of Title III. In (*continued on next page*)

As discussed above, it is entirely possible that Herring initiated monitoring and recording of Durgin's calls at McNeil's behest prior to determining that he needed to undertake such monitoring and recording for his own investigative purposes based on Durgin's infractions of the ban on use of special calling features. Herring testified that, in cases in which he intercepted inmate calls at the behest of outside law-enforcement agencies, he required a showing of "probable cause." He may have used the term "probable cause" loosely, equating it with supplying a "reason" for the request; however, if he meant "probable cause" in a legal sense, he certainly did not receive such a showing from McNeil. In addition, Herring testified, consistent with the dictates of MDOC Policy No. 21.3, that in such cases he needed to satisfy himself (and demonstrate to MCC Superintendent Burnheimer) that the outside agency's request implicated the security and orderly management of MCC. He testified persuasively that commission of crimes by incarcerated inmates necessarily implicates the facility's security and orderly management. Nonetheless, the information supplied by McNeil – which was simply that McNeil requested recording of Durgin's calls for an ATF criminal investigation – did not make clear whether he sought to investigate crimes committed prior to Durgin's incarceration and/or crimes Durgin was suspected of committing from jail.

That said, even assuming *arguendo* that Herring's disclosure to McNeil of the contents of the January 7, 2007 call was not appropriate to the proper performance of Herring's official duties, that is not the end of the matter. As emphasized by counsel for the government at hearing, for purposes of section 2517(1) it is necessary only that disclosure be "appropriate to the proper performance of the official duties of the officer *making or receiving* the disclosure." 18 U.S.C. § 2517(1) (emphasis added). Defense counsel made no argument that the disclosure to McNeil was inappropriate to the proper performance of McNeil's official duties. Nor, on this record, do I discern that it was.

---

addition, for purposes of section 2517(1), Herring obtained knowledge of Durgin's January 7, 2007 call by means authorized by Title (*continued on next page*)

McNeil's attention was drawn to Durgin following a home invasion and shooting in Buxton, Maine in April 2006. During the course of McNeil's investigation of that matter, he obtained information indicating that Durgin was involved in several unlawful activities, including possession of firearms following felony convictions, distribution of illegal drugs and intimidation of witnesses. Upon learning that Durgin was incarcerated at MCC, McNeil suspected that Durgin might continue to conduct unlawful activity from jail. He contacted the jail and was routed to Herring's office. He asked Herring's secretary, Vigue, what he needed to do to obtain copies of recordings of any calls Durgin had placed or might place from the jail. Vigue told him he needed to supply a reason or reasons for the request in a writing on ATF letterhead, and he did exactly that. The disclosure to McNeil accordingly was entirely appropriate to the proper performance of McNeil's official duties. *See Correa*, 220 F. Supp.2d at 67 (finding disclosure by jail official to state police officer and city police detective permissible pursuant to 18 U.S.C. § 2517(1) inasmuch as, while jail official inappropriately disclosed communication without court order in contravention of jail policy, "it is beyond dispute that it was proper for [the state police officer and city police detective], who were investigating the alleged crimes of Correa and Lewis, to obtain evidence against the two men by any lawful means."). No more was required pursuant to section 2517(1).

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days*

---

III – namely, consent. *See Correa*, 220 F. Supp.2d at 66.

*after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of April, 2007.

/s/ David M. Cohen  
David M. Cohen  
United States Magistrate Judge